# DOROTHY HOSKING v.
## METROPOLITAN HOUSE MOVERS CORPORATION.

138 N. W. (2d) 404.

November 5, 1965—No. 39,848.

*Joseph Robbie* and *Peter Lindberg,* for relator.

*Robins, Davis & Lyons* and *Arnold M. Bellis,* for respondent.

NELSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding benefits against relator-employer to respondent-employee.

Dorothy Hosking, employee of Metropolitan House Movers Corporation, was injured while in such employ on October 18, 1961, through the collapse of the secretarial chair on which she was sitting. The record indicates that the steel posts in the back of the chair hit the floor and, as a result, struck her in the back. On the day following the accident she was admitted to Bethesda Hospital in St. Paul, where she remained for 2 days. During her stay at the hospital and for a period of 2 weeks thereafter, she was treated by Dr. Richard Johnson, an orthopedist. After this time she returned to her job for part-time work. In September 1962 she found it necessary to seek further treatment for her back and at that time consulted Dr. John Fee, an internist.

Dr. Fee testified that Mrs. Hosking had sustained a previous injury to her back in a toboggan accident which occurred some 28 years prior to suffering the present injury. (Mrs. Hosking testified that the toboggan injury had caused her no lasting pain or discomfort beyond that of a few days and that the only other back pains she had suffered in the intervening period were during her pregnancies.) Dr. Fee further testified that, in his opinion, the toboggan accident had no bearing on Mrs. Hosking's present condition, and also stated that, in his opinion, the fall from the chair in the employer's office caused her present ailment.

Dr. Fee, under cross-examination, explained that as an internist he treated nonsurgical diseases of adults and that relating to bone injuries treatment on his part would be only in reference to diagnosis and non-surgical treatment. His diagnosis indicated that Mrs. Hosking was suffering from three conditions, namely, a wedge or compression fracture,

a narrowing of the lumbo-sacral disc, and mild osteoporosis. Dr. Fee explained his diagnosis by the following on cross-examination:

"Q. This disc disease, doctor have you diagnosed this disease or is this a possibility?

"A. No, she has disc disease. X-ray showed it and straight leg raising tests which she had when I first examined her. This would never be related to T12, never, but would have to be related to low lumbar injury where there is pressure on the nerve that supplies the leg. When you bring the leg up you pull the nerve up against either the iliac foramina or the disc."

Dr. Fee explained the progression of Mrs. Hosking's lumbar disc between the date of the accident and his own first X ray in September 1962, as follows:

"Q. Well, doctor, when a person aggravates a disc by an injury are you going to see narrowing on the day of the aggravation?

"A. No, sir.

"Q. Or the day after?

"A. No, sir.

"Q. Doesn't it take a period of time?

"A. Yes.

"Q. For the narrowing to appear on X-ray?

"A. Yes.

"Q. And isn't that exactly what happened here between October 1961 and your first X-ray of September 1962?

"A. Yes.

"Q. Is that consistent then with your opinion that the injury aggravated her disc condition?

"A. That is correct."

Employer contends that Dr. Fee had relied on the X-ray interpretation of other experts for his opinion. While Dr. Fee testified that when he first made a complete examination of Mrs. Hosking's back he himself took X rays and read his own X rays, he said that in such a matter as this "we have someone else interpret them because we are not radiologists." He was asked, "Did the roentgenologist's interpretation agree with your

own reading?" He answered, "Yes, except I felt she had narrowing in the lumbo-sacral junction and he didn't mention this on his report."

Dr. Fee expressed his own opinion in the following language:

"With the clinical history, and this is what we depend upon more than X-ray findings or anything else, we have a patient who has had an accident that we know can produce the mechanics of a fracture, and they find a fracture, and there may be a disagreement as to its age, but it is our opinion that this was a recent fracture from reviewing the films, that this woman did at this time from falling off the swivel chair suffer a fracture of T-12."

The following answer by Dr. Fee, when questioned on cross-examination, would hardly support the claim that he based that opinion on someone else's expert opinion:

"Q. Is it possible, doctor, to be anywhere near specific as far as whether this is a new or old fracture?

"A. It is highly more probable and looking at the film that this is a new fracture than one occurring when she had the toboggan accident. A fracture twenty years ago, I would expect much more sclerosis, ebernation, and hypertrophic changes around the vertebrae with a fracture or injury that long ago."

Dr. Fee disqualified himself from expressing a rating as to permanent partial disability, indicating that this evaluation would have to be done by an orthopedist. He made it clear that she had three conditions that are permanent—the narrowing of the lumbosacral joint, the disc degeneration, and a fracture.

The record shows that Mrs. Hosking was examined in May 1963 by Dr. Harry Hall, an orthopedic surgeon, at the employer's request. She was also examined before the hearing by Dr. Meyer J. Goldner, an orthopedic surgeon, at her request. Both of these orthopedists testified. Their testimony was contradictory in many, if not in all, respects.

Dr. Goldner apparently agreed with Dr. Fee on diagnosis and causal relationship. He testified as follows:

"Q. Now, what is your diagnosis of her condition; aside from the compression fracture do you believe she has a disc problem?

"A. I do.

"Q. And that that is causally related to the industrial accident?

"A. Yes.

"Q. Would you explain what that disc problem is in your opinion, what the extent of the problem is?

"A. Well, the X-rays taken in my office on May 18, 1964, as compared to those films taken in October of 1961 show a considerable increase in the narrowing of the disc space between L5 and the sacrum. I think that this represents a severe degree of degeneration that was brought on or accelerated by the injury that she sustained at that time.

"Q. Is it true, doctor, that an injury can set off symptoms of disc degeneration but the narrowing noted on X-ray will take sometime to make itself known?

"A. Yes. Even at surgery when we take out a fair part of the disc it may take several months to a year or two for the disc narrowing as such to show up on the X-rays."

Dr. Goldner further made it clear that from the 1961 X ray it could not be said one way or the other whether the compression fracture was recent or old. He did, however, relate the fracture to her work accident with the following statement:

"Well, with this type of any injury, that is sitting down on the buttocks, this is very frequently the type of mechanism that produces compression fractures of this type, especially where there is some degree of osteoporosis present, and if she had had any difficulty in this area prior to October 18, 1961, I believe she would have had symptoms in that area."

Dr. Goldner testified that Mrs. Hosking did have a disc problem aside from her fracture which he stated was causally related to her industrial accident. He assessed her permanent partial disability at 25 percent. That he ascribed such disability to her injury was brought out by the following:

"Q. Doctor, the rating of disability that you have ascribed here, is this rating in your opinion entirely due to the effects of the industrial accident?

"A. Yes.

"Q. And does not reflect any disability that she might have on account of this automobile accident?

"A. No."

Employer relies heavily upon the opinions of its medical expert, Dr. Hall, who also is an orthopedic specialist. He testified that in his opinion the compression fracture occurred prior to Mrs. Hosking's industrial accident and probably occurred some 20 years ago in a toboggan accident. Dr. Hall's testimony on cross-examination lends support to the commission's finding. For example:

"Q. * * * would you expect that the * * * symptoms from this fracture, if it was old, would disappear for twenty years and then come back in October, 1961, or how would you explain it?

"A. Yes. In a young individual who suffers a compression fracture the symptoms as a rule disappear completely, and then can re-appear *if they have some other injury*. That's just not an uncommon finding." (Italics supplied.)

And again:

"Q. If as a result of her injury—let's say if the history of her injury is true, could that injury have brought back or produced the symptoms that she complains about in the T12 area?

"A. Yes, I believe it could.

"Q. And do you have anything to doubt that that's what probably occurred here in this case—any reason to doubt that that's what actually happened here?

"A. No, I have—

"Q. On the basis of the clinical history?

"A. I have no reason to doubt it, no."

The record is clear that Dr. Fee in the almost 2 years he treated Mrs. Hosking verified time and again that she complained of and he found objective evidence of symptoms in the lumbar area as distinguished from T12, which is in the thoracic area. Dr. Goldner's findings likewise show a record of complaints and findings in the lower lumbar area.

Employer argues that the referee and the commission should have appointed a neutral physician pursuant to Minn. St. 176.155, subd.

2,[1] in view of the fact that the medical testimony of the two orthopedic surgeons was diametrically opposed.

There was no move for the appointment of a neutral physician at the hearings before the referee. Such request was made for the first time when relator appealed to the commission from the referee's findings and determination.

The statute provides that the commission *may* upon its own motion or upon the request of any interested party designate a neutral physician. Clearly, the statute is permissive rather than mandatory, and discretionary with the commission.

Rule WC 5, Rules of Practice Before the Industrial Commission, provides:

"Whenever * * * it appears to be necessary or advisable that a neutral physician be appointed * * * the referee or commission hearing the case shall so inform the attorneys * * * and request them to agree upon such neutral physician * * *."

Thus the rule relative to the appointment of a neutral physician, amplifying the statute, states that it must be based on the commission's belief that such appointment is necessary or advisable. A reading of the memo-

---

[1] § 176.155, subd. 2, provides: "In each case of dispute as to the injury the commission, or in case of a hearing the commissioner or referee conducting the hearing may upon its own or his own motion, or upon request of any interested party, made in compliance with the rules of the commission regulating the proper time and forms for such request, designate a neutral physician of good standing and ability to make an examination of the injured worker and report his findings to the commission, a commissioner, or referee as the case may be. The commission, commissioner, or referee, as the case may be, may request the neutral physician to answer any particular question with reference to the medical phases of the case, including questions calling for an opinion as to the cause and occurrence of the injury insofar as medical knowledge is relevant in such answer. A copy of the signed certificate of such neutral physician shall be mailed to the parties in interest and either party, within five days from date of mailing, may demand that such physician be produced for purposes of cross-examination. Such signed certificate of a neutral physician is competent evidence of the facts stated therein. The expense of such examination shall be paid as ordered by the commission, commissioner or referee."

randum opinion of the commission would indicate that they clearly recognized the conflict in the medical testimony and determined, in the exercise of their judicial discretion, that the appointment of a neutral physician was unnecessary.

The legislature has vested in the commission the discretionary power to appoint a neutral physician when, in the exercise of its judicial discretion, it would be needful or desirable in arriving at a decision. Section 176.155, subd. 2, contains no absolute direction to the commission to appoint a neutral physician nor does it contain a mandatory provision to that effect. The general rule followed in this state is that where there is a conflict in the testimony of medical experts that conflict must in the final analysis be resolved by the commission as the trier of fact. Richter v. Shoppe P. & H. Co. 257 Minn. 108, 100 N. W. (2d) 96; Kruchowski v. Swift & Co. 201 Minn. 557, 277 N. W. 15; Niess v. Superior Packing Co. 249 Minn. 263, 81 N. W. (2d) 773.

This court said in Hunter v. Zenith Dredge Co. 220 Minn. 318, 19 N. W. (2d) 795, that it was unconstitutional for a medical board's findings to be conclusive upon the Industrial Commission. It was held in that case that due process requires that the findings of the Industrial Commission be based upon substantial evidence contained in the record. The Hunter case clearly demonstrates the wide latitude given to the Industrial Commission to resolve facts and factual disputes whether they grow out of conflicting medical testimony or otherwise.

Employer cites the recent case of Chinn v. Board of Education, 268 Minn. 455, 129 N. W. (2d) 788, as authority for its contention that a neutral physician should have been appointed. That case in no way conflicts with the right of the Industrial Commission to exercise its judicial discretion reasonably within the statutory bounds.

A reading of Rehak v. St. Paul Terminal Warehouse Co. 206 Minn. 96, 288 N. W. 22, indicates a similarity of facts with the instant case. This court held in the Rehak case that the mere fact that medical experts expressed divergent opinions as to the cause of disability in a workmen's compensation case does not obligate the commission to open the case and appoint a neutral physician. In Kruchowski v. Swift & Co. *supra,* this court said (201 Minn. 559, 277 N. W. 17):

"* * * No reason appears why the testimony of the company's doctors should be conclusive. * * * 'They could not conclude the commission by their testimony. * * * The testimony of physicians is useful. They may be helpful in estimating the functional impairment; and a standard of measurement of disability which they adopt, if any, may be useful. But the amount of disability is a question of ultimate fact for the commission.' "

See, also, Peterson v. Holland Piano Mfg. Co. 4 Minn. W. C. D. 68; Grafenberg v. Village of Franklin, 9 Minn. W. C. D. 228.

■ The employer appears to contend that because the employee is capable of doing secretarial work she has not sustained any permanent partial disability. This is not the test of permanent partial disability. That test is loss of function and of use without regard to the particular work of the employee which she might be capable of performing. The amount of disability is an ultimate fact the determination of which has not been abdicated to the medical profession under our Workmen's Compensation Law.

In State ex rel. Globe Ind. Co. v. District Court, 136 Minn. 147, 150, 161 N. W. 391, 392, this court had the following to say:

"* * * It is doubtless a difficult question, on almost any evidence, to determine just how an injury that is not equal to a total loss of a member compares in extent with such a total loss. But the law requires that this comparison be made * * *. Clearly much is left to the judgment of the trial court."

And in Gurtin v. Overland-Knight Co. 179 Minn. 38, 39, 228 N. W. 169, we said:

"* * * Whether the physicians have a standard by which they determine the extent of permanent partial disability does not appear; but in any event the statute does not prescribe a rule or method of determining the extent of disability. It is left to the judgment of the trier of fact."

■ Employer has urged that this court should remand the decision herein to the Industrial Commission for the appointment of a neutral physician who can evaluate this employee's injury in light of his independent examination and such other evidence as he may need. The power to grant

a new hearing is statutory and is governed by Minn. St. 176.461. This court has frequently held that the determination of whether there is sufficient cause to justify the vacation of an award and the granting of a new hearing is a matter which rests in the sound discretion of the Industrial Commission and this court will not reverse the commission unless there is a clear abuse of discretion. Nelson v. C. F. Scully Const. Co. 252 Minn. 518, 90 N. W. (2d) 903, and cases cited therein.

■ We have repeatedly said that findings of the Industrial Commission will not be disturbed on appeal unless manifestly contrary to the evidence or unless a consideration of all the evidence and the inferences permissible therefrom would require reasonable minds to adopt a contrary conclusion.

Viewing the record as a whole we reach the conclusion that the appeal presents nothing but fact questions. We think the evidence amply sustains the commission's finding of causal relationship between the injuries and the employment.

Respondent is allowed $250 attorney's fees.

Affirmed.

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.