THOMAS DUKEK v. GREIF BROTHERS COOPERAGE AND ANOTHER.

160 N. W. (2d) 159.

July 5, 1968—No. 40,921.

· *John S. Connolly,* for relator.

*McLeod & Gilmore,* for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Certiorari to review a decision of the Industrial Commission.

On December 27, 1961, relator was employed by respondent employer, Greif Brothers Cooperage, as a steel cutter. On that day a 300- to 400-pound bundle of steel which he was handling dropped on his left knee and then slid down the front of his left leg. The injury caused discoloration of the left leg from the knee down to the foot, although apparently the most severe damage occurred in the area of the left ankle and foot.

Within a few days after the accident, infection developed in the left ankle and relator was admitted to St. Luke's Hospital. At that time there was no evidence of arterial occlusion. Doctors at the hospital gave relator penicillin shots and placed hot towels on the lower part of his left leg. He was released from the hospital January 19, 1962, and returned to work with Greif Brothers March 5, 1962, even though, he said, the leg continued to bother him after that time. Greif Brothers compensated him for loss of income and medical expenses incurred in the period following the injury. He continued to work for them until December 1963 and, in addition, retained a second full-time job until December 1962.

In December 1963, relator went to Dr. Benjamin J. Singer, the physician who had treated him at the time of the injury, complaining of soreness in his left foot and leg. He returned for treatment once in December and in February 1964. On March 11, 1964, Dr. Singer noticed that there was no pulsation in relator's feet. Five days later he was readmitted to the hospital and given whirlpool treatment. After an X ray had revealed some calcification in his legs, he was given an arteriogram, which revealed an occlusion of the left anterior tibial artery, an artery situated about 14 inches above the foot and behind the bone located near the surface of the front part of the leg. He was released April 8 but treated

again as an outpatient on April 10, 15, and 21, 1964. That, apparently, was the last medical treatment he had.

On March 18, 1965, relator filed a claim for workmen's compensation with the Industrial Commission, alleging that respondents, Greif Brothers and Liberty Mutual Insurance Company, its liability insurer, were liable for temporary total disability from December 31, 1963, to April 23, 1964.

At a hearing before a referee of the Industrial Commission on April 21, 1965, Dr. Singer testified that in his opinion the occlusion was caused by the injury of December 27, 1961. He said that an occlusion could be caused by either arteriosclerosis (hardening of the arteries) or injury to the artery and, while he admitted that a man of relator's age would ordinarily be subject to some arteriosclerosis, he felt that because of the ankle infection, the occlusion here had resulted from an injury. The occlusion developed slowly, he said, because the main artery was not cut off, and thus there was collateral circulation. Dr. A. Ross Lerner, an orthopedic surgeon who examined relator January 22, 1965, testified that he also thought the injury caused the occlusion, since relator had no history of any organic diseases of the type that could have caused the occlusion and, furthermore, an organic disease would not affect only one artery.

Respondents called Dr. Arthur Pedersen, a surgeon, who examined relator on April 23, 1964. Dr. Pedersen said that the occlusion was caused by calcium deposits and hence was arteriosclerotic rather than traumatic. Any occlusion resulting from the injury, he said, would occur within 24 hours of the injury. It was also his opinion that occlusion of the anterior tibial artery, which is located 14 inches above the foot, could not have been caused by injury to the foot.

The referee denied relator's claim. On appeal, the Industrial Commission, finding that there was no causal connection between the injury and the occlusion, upheld the referee. Commissioner James Pomush, dissenting, said he thought the commission should not decide the appeal without the aid of a neutral vascular specialist.

The issues here are whether the commission erred in not obtaining the assistance of a neutral vascular specialist and whether the evidence is

sufficient to sustain the finding that the injury did not cause the occlusion.

Relying mainly on Chinn v. Board of Education, 268 Minn. 455, 129 N. W. (2d) 788, relator contends that the commission erred in not seeking assistance from a neutral physician. In Chinn, the employee, a man with a long history of ailments, slipped and fell as he was leaving the employer's premises. He later developed stiffness in his left arm and shoulder. Two doctors, pointing out that the employee was physically active before the fall, attributed the disability to a spinal condition which, they claimed, had been induced by the injury. Two other doctors, alleging that the condition in question attacked only the young and produced symptoms not present in that case, traced the disability to the ailments which had existed before the fall. The commission, which did not obtain the assistance of a neutral doctor, upheld an award to the employee. This court, stating that "we cannot find any basis in the record which permits or justifies acceptance of one medical opinion in preference to the other," 268 Minn. 460, 129 N. W. (2d) 791, remanded the case to the commission with directions to appoint a neutral doctor under Minn. St. 176.155, subd. 2. That subdivision provides in part:

"In each case of dispute as to the injury the commission * * * may upon its own * * * motion * * * designate a neutral physician of good standing and ability to make an examination of the injured worker and report his findings to the commission * * *."

Relator contends that Chinn compels appointment of a neutral physician in this case. However, as the quoted language from Chinn indicates, the commission is required to appoint a neutral physician only when the record contains no basis for choosing between conflicting expert opinions. In Hosking v. Metropolitan House Movers Corp. 272 Minn. 390, 138 N. W. (2d) 404, a woman was injured when the chair on which she was sitting collapsed. She had suffered a back injury in a toboggan accident 28 years previously, but testified that she had had no lasting pain from that accident. About a year after the chair accident she was treated for back pains and thereafter sought workmen's compensation. The attending physician and another doctor testified in the compensation pro-

ceeding that the chair accident caused the back trouble. A third attributed it to a condition allegedly arising from the earlier accident. The commission, without appointing a neutral physician, found for the employee. This court affirmed, pointing out that the original accident affected an area of the back different from that in which the employee subsequently experienced pain. "Section 176.155, subd. 2," we said, "contains no absolute direction to the commission to appoint a neutral physician nor does it contain a mandatory provision to that effect. The general rule followed in this state is that where there is a conflict in the testimony of medical experts that conflict must in the final analysis be resolved by the commission as the trier of fact." 272 Minn. 397, 138 N. W. (2d) 408. See, also, Anderson v. Armour & Co. 257 Minn. 281, 101 N. W. (2d) 435.

This case is more closely akin to Hosking than Chinn. The record contained sufficient evidence from which the commission could choose among conflicting expert opinions. The occlusion did not set in until well over a year after the injury. Admittedly a man relator's age is subject to hardening of the arteries. Dr. Singer's records disclose that he found calcification on the bones. This certainly tends to support Dr. Pedersen's contention that the occlusion resulted from calcification in the artery. Furthermore, the occlusion occurred at a point quite a distance from the point at which the major injury occurred. It is true that the steel bundle discolored the entire lower portion of the leg. However, the artery in question is lodged behind the bone lying at the front part of the lower leg, so the referee and commission might have concluded that the impact was not sufficient to affect the artery. With this evidence to support its choice among conflicting expert opinions, the commission did not abuse its discretion by failing to appoint a neutral doctor. In view of the plausible cases made by both sides, there is merit to the positions taken by both the majority commissioners and the dissenting one. However, it was a fact question for them to decide and we must affirm the majority. The test is not how the issue would be resolved as an original proposition but, rather, whether the commission abused its discretion. When its decision is tested by the Hosking standard, it seems clear it did not.

■ Relator's second issue—that the commission's finding lacks sup-

port in the record—is nothing more than a restatement of the first. In analyzing the first issue, we set forth the evidence supporting the commission's finding. The commission's findings will not be disturbed on appeal unless clearly contrary to the evidence, Hosking v. Metropolitan House Movers Corp. *supra,* and under that test that evidence is clearly sufficient.

Relator cites medical treatises to the effect that a traumatic occlusion may develop over a long period of time. Those treatises were not submitted in evidence below, and hence may not be considered by this court. They are not, in any event, admissible evidence even before the commission, for medical treatises may not be admitted as substantive evidence. Zubryski v. Minneapolis St. Ry. Co. 243 Minn. 450, 68 N. W. (2d) 489.

Affirmed.