Rolland O. ERICKSON, (deceased) by Shirley J. ERICKSON, Relator,

v.

GOPHER MASONRY, INC., et al., Respondents.

No. 82–502.

Supreme Court of Minnesota.

Jan. 14, 1983.

Johnson & Getts, Minneapolis, for relator.

Lommen, Nelson, Sullivan & Cole and Frederick M. Hass, Minneapolis, for respondents.

YETKA, Justice.

Rolland Erickson suffered a work-related back injury on July 6, 1979. He died March 9, 1980, from causes unrelated to the injury. His wife Shirley filed a claim petition for permanent partial disability compensation on August 11, 1980. The insurer admitted primary liability for the work injury, but disputed the permanent partial disability claim. On July 8, 1981, the compensation judge denied Mrs. Erickson's claim. The Workers' Compensation Court of Appeals affirmed, with one judge dissenting. Review is before this court on writ of certiorari. We remand for new findings.

On July 6, 1979, Rolland Erickson suffered an injury to his lower back in the course and scope of his employment with respondent, Gopher Masonry, Inc. One month later, Erickson entered the emergency room at Methodist Hospital and was examined by Dr. Bruce Idelkope. Erickson complained of back pain with pain radiating into the left buttock and left calf. Dr. Idelkope's examination found a significant degree of paravertebral muscle spasm in the lumbar region of the back, stigmata of a stroke suffered 13 years ago, some right-sided weakness, and some cranial nerve abnormalities.

For the next several months, Dr. Idelkope treated Erickson for the back injury. Myelograms were taken in August 1979, February 1980, and March 1980. All three myelograms indicated defects and irregularities in the lumbar region of Erickson's back. He was treated in what the medical profession refers to as "a conservative manner," with bed rest and medication each time he was hospitalized. When hospitalized the last time in early March 1980, Dr. Idelkope indicated that treatment had not yet been completed and that surgery was a possibility. Erickson died on March 9, 1980, from other causes.

At the compensation hearing, Dr. Idelkope stated that, at the time of death, Erickson's disability rating was 15% to the back and 10% to the left leg. He also stated that he was unable to give better than a 50/50 estimate of permanent disability. He was never asked whether some permanent disability would result even if surgery was performed. He did state, however, that he would be surprised if Erickson improved with further conservative treatment, that is, without surgery.

The issues raised in this appeal are:
1. Whether the death of an injured employee from causes unrelated to the workplace injury affects an award of

permanent partial disability benefits pursuant to Minn.Stat. § 176.021, subd. 3 (1980) where the degree of disability was not determined prior to the employee's death.

2. Whether the Workers' Compensation Court of Appeals erred in finding that relator failed to establish permanent partial disability and that the degree of disability was not ascertainable prior to the employee's death; and

1. The initial determination to be made in this case is whether permanent partial disability payments may be awarded in situations in which the compensation claim is filed after the nonwork-related death of an employee and no disability payment or determination is made prior to the death.

The statutory provision applicable here provides:

> The right to receive temporary total, temporary partial, permanent partial or permanent total disability payments shall vest in the injured employee or his dependents under this chapter or, if none, in his legal heirs at the time the disability can be ascertained and the right shall not be abrogated by the employee's death prior to the making of the payment.

Minn.Stat. § 176.021, subd. 3 (1980). This provision was added to the Workers' Compensation Act (hereinafter WCA) as a 1977 amendment.[1] A review of the legislative history indicates that it was added, at least in part, as a legislative response to decisions of this court denying benefits to employees who died from nonwork-related causes prior to disability payments or determinations being made. *Umbreit v. Quality Tool, Inc.*, 302 Minn. 376, 225 N.W.2d 10 (1975); *Tierney v. Tierney & Co.*, 176 Minn. 464, 223 N.W. 773 (1929).

The continuing validity of *Umbreit* is dependent on this court's interpretation of the 1977 amendment. The language, however, is ambiguous and susceptible to differing interpretations.

The amendment uses the words "The right to receive * * * payments shall vest in the injured employee or his dependents * * * or, if none, in his legal heirs *at the time the disability can be ascertained.*" This language could be held to at least codify the *Tierney* rule which restricts payment to only "accrued" benefits. The language could also be interpreted as requiring a fixed award prior to death, pursuant to either a stipulation or an adjudication, consistent with *Umbreit*. The final phrase of the provision, "the right shall not be abrogated by the employee's death prior to the making of payment," lends some support to this restrictive interpretation.

The interpretation adopted by the Workers' Compensation Court of Appeals allowing recovery after the death of the employee is supported by an examination of language rejected by the legislature in formulating the amendment and by the general policy considerations of the WCA. The legislature specifically rejected "is ascertained" and chose instead "can be ascertained." When coupled with the provision allowing the right to payment to vest in "his dependents * * * or, if none, in his legal heirs," the provision appears to express a legislative intent to allow dependents or heirs to recover whether the disability was ascertained prior to or after the death of the employee. In addition, cases of this court addressing the death of employee issue involved situations in which the claim for disability payments was not made until after the employee's death. If the legislature was responding to the harshness of these cases, it seems likely that their intent was to allow recovery in the present case. The cumulative effect of the above factors supports a liberal interpretation of the statutory language.

A final consideration involves the general policy of the WCA to compensate injured employees. To deny benefits due to random and arbitrary happenstance is contrary to this general policy.

---

1. Act of May 27, 1977, c. 342, § 4, 1977 Minn. Laws 697, 699–700. The 1977 amendment included only permanent partial disability payments. A 1979 amendment added temporary total, temporary partial, and permanent total disability payments to the provision. Act of June 7, 1979, c. 3, § 30, 1979 Minn.Laws 1256, 1271–72.

■ The Workers' Compensation Court of Appeals interpreted the statute to allow recovery by heirs or dependents if the employee's permanent partial disability is determined to have been capable of ascertainment prior to the employee's death and the claimant successfully establishes the extent of disability. We adopt this interpretation of the statute.

2. The compensation judge's determination that Mrs. Erickson failed to establish the degree of permanent partial disability was affirmed by the court of appeals. Disability compensation was denied because Dr. Idelkope's testimony, the only testimony in the case, was deemed too speculative and conjectural to provide a basis for compensation.

■ The lower court's findings as to the degree of disability is one of ultimate fact. *Hosking v. Metropolitan House Movers Corp.*, 272 Minn. 390, 138 N.W.2d 404 (1965). As such, it will not be reversed on appeal to this court unless, when viewed in the light most favorable to the findings, "[C]onsideration of the evidence and inferences permissible therefrom requires reasonable minds to adopt a contrary conclusion." *Talmage v. Medtronic, Inc.*, 315 N.W.2d 433, 437 (Minn.1982). In addition, this court has held that medical testimony, though helpful, is not dispositive on the issue of disability. Rather, it is for the trier of fact to determine disability in light of all the evidence in the case and after considering the many factors that may go into the determination. *See Hosking,* 272 Minn. at 397, 138 N.W.2d at 409 (1965).

■ A careful reading of Dr. Idelkope's testimony reveals some support for the decision below. The doctor provided only a 50/50 prediction of recovery versus continued disability. He stated that his disability rating was based on the employee's condition at the time of his death and that a prognosis of future permanent disability to a reasonable degree of medical certainty was impossible. In addition, the doctor stated that it would be very difficult to project the chances of a full recovery beyond a 50/50 likelihood.

Several factors, however, support a reversal. First, it is clear from Dr. Idelkope's deposition that a large part of his inability to be more certain was due to the possibility of future surgery. Mr. Erickson had undergone 7 months of conservative treatment and shown little or no improvement. Immediately prior to death, the doctor contemplated surgery in the event that no further improvement was shown. The outcome of the surgery, if performed, was impossible to predict. The doctor also stated, "I would have been very surprised had he [Erickson] improved with further conservative treatment in view of the past six months of conservative treatment over which he really didn't improve at all."

This court has held that an injured employee cannot be forced to undergo major surgery and that evidence of the employee's vocational potential which assumes such surgery is irrelevant. *Rauma v. Paper Calmenson & Co.,* 286 Minn. 17, 174 N.W.2d 244 (1970). In *Rauma,* the contemplated surgery was a fusion of the lumbosacral spine from the fourth lumbar vertebra to the sacrum. The record here does not indicate the exact nature of the surgery contemplated by Dr. Idelkope. The unpredictable result of the surgery (only a 50% chance of any resulting improvement) and the length of conservative treatment prior to recommending surgery indicate that the surgery should be classified as "serious." Evidence relating to the possibility of serious surgery is irrelevant to the disability finding. In addition, Dr. Idelkope's testimony was considerably more certain when discussing the effects of continued conservative treatment.

The natural inclination of those in the medical profession to equivocate on precise probabilities is another factor in supporting a remand on the disability issue. This court has recognized that caution should be used when evaluating medical testimony. In *Boldt v. Jostens, Inc.,* 261 N.W.2d 92 (Minn. 1977), the court evaluated testimony linking exposure to glue fumes with Goodpasture's Syndrome. The employer had claimed that the doctor's testimony did not express rea-

sonable medical certainty and was no more than a hypothesis. The court of appeals had held in favor of the employee, partially in reliance on this testimony. The court stated:

> Read in isolation, some of the doctor's statements appear to support their [Relators] position. In seeking the real meaning of his testimony, however, the caution with which medical experts render opinions should be recognized. As Professor Larson states:
>
> > " * * * It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his statements on the witness stand. * * * The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly trained scientific mind to refrain from unqualified statements or opinions on such matters as causation." 3 Larson, Workmen's Compensation Law, § 80.32.

261 N.W.2d at 93–94.[2]

A final consideration is the nature of lower back injuries and resultant minimal disability. Both the compensation judge and the court of appeals mentioned the lack of evidence in the record going to minimal disability. Even if the evidence did not support the specific percentage of disability testified to by the doctor, the evidence as a whole strongly indicates some degree of permanent partial disability. The trier of fact bears the responsibility of making this determination, but has seemingly failed to

do so, choosing instead to reject the claim for disability in total.

The doctor estimated disability at 15% to the back and 10% to the leg at the time of death. He clearly felt further improvement was highly unlikely without surgery. No employee needs to accept surgery under these conditions. We have a clear disability rating at the time of death and a strong likelihood of some permanent disability.[3]

The case is thus remanded for a confirmation of a permanent partial disability rating of 15% to the back and 10% to the leg or, in the alternative, for a finding of what percent disability could be expected without regard to the potential surgery.

Remanded for further hearings consistent with this opinion.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2. It must be noted that *Boldt* involved the issue of causation, not disability, and upheld the lower court's decision rather than using the speculative nature of medical opinion to reverse a finding contrary to the employee.

3. Judge Robert B. McCarthy of the Workers' Compensation Court of Appeals, in his dissent, states in part:

> The Compensation Judge and the majority in the instant case seem to consider that the attending physician's report was insufficient and speculative. On the contrary, I find it to be well within the bounds expressed by our Supreme Court in *Boldt vs. Josten's Inc.*, 261 N.W.(2d) 92, 30 W.C.D. 178.

> I also do not think the attending physician's testimony is speculative. The question of future surgery may, according to the attending physician, Dr. Idelkope, alleviate some of the permanent partial disability. It is axiomatic in this state that the law is that the employee does *not* have to embark on surgery in order to alleviate this condition. (emphasis mine)

> I think the record is sufficiently clear in the instant case that the employee has sustained 15 percent permanent partial disability of the back and 10 percent of the leg and I would so award these benefits to the widow.