ROBERT L. HUNTER v. ZENITH DREDGE COMPANY AND ANOTHER.[1]

July 6, 1945.

No. 33,984.

[1]Reported in 19 N. W. (2d) 795.

*John H. Louisell* and *William D. Gunn,* for relator.

*W. O. Bissonett,* for respondents.

THOMAS GALLAGHER, JUSTICE.

*Certiorari* to review a decision of the industrial commission

holding relator ineligible for compensation and other benefits under the workmen's compensation act.

Relator's claim petition asked compensation for disability due to an accident arising out of and in the course of his employment as a slagger at the Zenith Dredge Company, employer, or for disability due to an occupational disease arising out of such employment. The answer denied these allegations.

On June 7, 1944, at the close of the hearing, the referee determined that the employe had not sustained an accidental injury and ordered that a medical board be appointed in the manner provided by L. 1943, c. 633, § 11[2] (Mason St. 1944 Supp. § 4327-6), to de-

[2]"11. * * * If such finding and conclusion are in favor of the petitioner or if no questions other than that of occupational disease is presented by the pleadings, the commission, commissioner or referee shall forthwith appoint a medical board of three doctors of medicine selected from a panel of fifteen nominees chosen by the Dean of the College of Medicine of the University of Minnesota, the Council of the Minnesota State Medical Association and the Governor of Minnesota. Ten of these nominees shall be doctors of medicine with at least five years' specialization in the field treatment and care of industrial diseases, and five of these nominees shall be doctors of medicine with at least five years' specialization in the field of X-ray diagnosis and treatment. The medical board shall be appointed in the following manner: The commission shall furnish to each party to the proceeding a copy of the panel of doctors, together with a request that each party select one doctor of medicine from said panel and that the two doctors of medicine so selected shall choose a third doctor of medicine to constitute the medical board. The three doctors of medicine so agreed upon shall be appointed by the commission as the medical board. If within ten days after such request the parties to the proceeding fail to make their individual selections from the panel, or the two doctors of medicine thus selected fail to agree upon a third to be chosen, the commission, commissioner or referee shall forthwith appoint such additional number of doctors of medicine from said panel as may be necessary to constitute a medical board of three members.

"The medical board shall determine such medical questions raised by the pleadings and such as are certified to it by the commission. Its findings among others shall state whether the employee is affected with an occupational disease as claimed in his petition, and whether such disease is an occupational disease within the provisions and definitions of occupational disease as contained in this act, the approximate dates said disease

termine whether the employe had been afflicted with an occupational disease within the provisions and definitions of L. 1943, c. 633, § 3(n),[3] (Mason St. 1944 Supp. § 4326[n]). On August 24, 1944, the medical board, pursuant to § 11[4] of the 1943 act, made

was contracted and the date of disablement of said petitioner. In case the claim is based on silicosis or asbestosis, at least one member of the medical board shall be a physician skilled and specializing in X-ray diagnosis and treatment.

"The medical board may examine the employee, including X-ray examinations, hear and examine witnesses on controverted medical issues, and make such other examinations as it deems necessary to a full presentation and understanding of the medical issue before them. Either the employer or the employee may be represented at the examinations of the employee and hearings before the medical board by the same physician who appeared for such party at the hearing before the referee and such doctor shall be given full opportunity to participate therein. If the employee refuses to be examined by the medical board, no compensation shall be paid to such employee by the employer, and the proceedings shall be suspended, during the period such refusal continues."

[3]"3(n). The words 'occupational disease' mean a disease arising out of and in the course of employment peculiar to the occupation in which the employee is engaged and due to causes in excess of the hazards ordinary of employment. Ordinary diseases of life to which the general public is equally exposed outside of employment are not compensable, except where such diseases follow as an incident of an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational disease hazard. A disease arises out of the employment only if there be a direct causal connection between the conditions under which the work is performed and if the occupational disease follows as a natural incident of the work as a result of the exposure occasioned by the nature of the employment. An employer is not liable for compensation for any occupational disease which cannot be traced to the employment as a direct and proximate cause and is not recognized as a hazard characteristic of and peculiar to the trade, occupation, process, or employment or which results from a hazard to which the workman would have been equally exposed outside of the employment."

[4]"The medical board shall, immediately after the conclusion of such examinations and hearings, file its findings and conclusions with the commission, signed by all the members of said board participating. If any member fails to sign the report of the board he shall state in writing to the commission his reasons therefor. The report of the medical board shall in-

its report determining that relator was affected with synovitis of the right knee and that such synovitis was not an occupational disease within the provisions of the 1943 act.

The referee, pursuant to said § 11,[5] adopted such report as part of his findings and disallowed relator's claim. Relator thereupon appealed to the industrial commission, which duly affirmed and adopted the findings of the referee. In the memorandum attached to the commission's decision it was stated:

"* * * If the law had made this commission the arbiter of the facts in occupational-disease cases we would have had no hesitancy upon the record before us in holding that the petitioner was disabled as a result of an occupational disease. We would not even have thought it necessary to appoint a neutral physician, who would have been subject to cross-examination. However, the law does not make us the judges of controverted medical questions involving occupational disease. That becomes the exclusive function of the medical board and the medical board is not required to determine that question upon the testimony taken before the referee at a hearing prior to the appointment of the medical board."

The medical board's report filed with the commission included the following:

"1. Names and addresses of doctors other than members of the board appearing at examinations or hearings: S. S. Houkom, M. D., Duluth; F. J. Lepak, M. D., Duluth; C. A. Scherer, Duluth.

\* \* \* \* \*

"3. Medical reports and exhibits considered by board. (Submit to Industrial Commission with this report): Transcript of the hearing before referee C. H. Schaefer, March 29, 1944, and X-ray of the knees of Mr. Hunter taken at St. Mary's Hospital, 8/19/44."

---

clude the names of the doctors who appeared at such examinations and hearings and such medical reports and exhibits as were considered by it."

[5] "* * * The findings and conclusions of the medical board, in so far as the same concern such controverted medical questions, shall be adopted by the commission as its decision on such questions."

Three witnesses testified before the referee as to the nature and cause of relator's disability. These were relator, Dr. F. J. Lepak, called on his behalf, and Dr. S. S. Houkom, called on behalf of the employer and its insurer.

Relator testified that in his work on the night shift he worked on steel plates in the open air, resting his right knee thereon as he applied an air gun to such plates to remove particles of slag attached thereto; that he moved about on the plates by raising his knee alternately with his left foot and walking ahead in that manner, applying the air gun as he moved; that he first observed difficulty with his right knee about two weeks before he was forced to quit his employment on November 26, 1943; that on that date he was forced to quit because he could not stand the pain any longer. He testified that prior to the commencement of his disability he had been working on an 11-hour shift five nights a week and five hours on Saturday; that before he entered respondent's employ he had had no trouble with his knees; that, after he terminated such employment and rested his knee for some time, the disability disappeared, and at the time of the trial he had completely recovered; that his doctor had advised against his resumption of this type of work; and that he had not resumed same after the termination referred to.

Dr. F. J. Lepak testified that upon examination on November 29, 1943, he found that relator could not move his right leg; that his knee was swollen; that pressure was painful; that relator had a temperature of 102 degrees. He diagnosed relator's disability as an inflammatory condition of one of the bursae of the knee joint, and said that there may have been some type of infection present. He testified that, in his opinion, trauma caused by the jerking of the air gun and constant contact with the cold steel plates contributed to relator's disability; that the coldness of the steel plates was a direct factor.

With reference to the infection, he stated that it probably had not existed at the beginning of the disability but that something subsequent thereto had caused it and increased relator's tempera-

ture. He stated definitely that relator was not afflicted with arthritis. He definitely connected relator's disability with his employment. He testified that working on cold steel plates or on cold surfaces and floors frequently led to bursitis, and that in the shipyards where relator was working they had similar, although not identical, difficulties with other workers. He expressed the opinion that relator's long hours of work without changing his position aggravated the condition, and that if the men at the shipyards were changed occasionally they would avoid conditions of this kind. He testified that he had seen bursitis in shipyard workers more in the past two years; that the condition is more frequent among employes whose knees and elbows come in contact with hard surfaces; and that he could find no other cause to bring about this condition here.

Dr. S. S. Houkom, on behalf of respondents, testified that the bursa causing the disability was definitely connected with the knee joint; that he took X rays of the knee, which did not disclose any evidence of arthritis; and that in his opinion the factor of kneeling on cold plates and bending the knee a lot brought about the disability, although other factors may have been there. He diagnosed the disability as synovitis, which he described as more generalized than simple bursitis—that in reality relator had bursitis coupled with synovitis and that his disability might be diagnosed as either bursitis or synovitis, or both. He testified that in his opinion bursitis and synovitis may be characterized as diseases, although they may also be caused by trauma; that, in substance, bursitis or synovitis simply means inflammation either of the lining of the knee joint or the bursa; that it could be called a disease in a broad sense; that there was a true relationship between the type of work relator was doing on the cold steel plates and his disability; that a main factor in this respect was relator's constant use of his right knee, kneeling on it, getting up and down on it quite a bit, and flexing and extending the knee joint rather often; that there was more strain on relator's knee joint in the position in which he worked than in ordinary activities, such as standing; that irritation

caused by jarring of the air hammer might be a factor, although not as much a factor as the process of kneeling and using the knee as described. He testified that he has seen some bursitis among shipyard workers, especially prepatellar bursitis, which affects the bursa in front of the kneecap but which is not identical with relator's type of bursitis; that bursitis is commonly seen in shipyard workers required to come in contact with hard surfaces, which disposes them to the development of bursitis or synovitis. He conceded that if relator had not been doing the particular type of work he did his condition would not have developed, at least to the extent that it did; that the chief factor which brought about the disability was the manner in which relator was required to work, which was peculiar to his occupation.

· Counsel for relator, on appeal to the industrial commission, served a Notice to Produce upon respondents and upon the members of said medical board, directing them to furnish relator with a full, complete, and certified *transcript of the proceedings* had by the board. No response was made thereto, and relator has at no time been able to ascertain whether *additional* testimony or evidence was considered by the board, and, if so, what comprised the same.

■ L. 1943, c. 633, § 11, provides that the medical board created by said amendment "may examine the employee, * * * hear and examine witnesses on controverted medical issues, and make such other examinations as it deems necessary to a full presentation and understanding of the medical issue before them"; that its findings shall state whether the employe is affected with an occupational disease within the provisions and definitions of the statutes; and that it shall file its findings with the commission, including the names of doctors appearing, as well as medical reports and exhibits considered by it. No provision or requirement in said act makes it necessary for the medical board to file a transcript of the evidence upon which its findings or determination is based.

Due process requires that the evidence on which an agency, board, or commission bases its findings be ascertainable. This court must have the necessary data on which to determine the cor-

rectness thereof. A claimant for workmen's compensation, under § 176.61 (§ 4320), is guaranteed a right of review by the supreme court, which may examine findings of fact and determine whether they have a sufficient foundation in the evidence. Since no transcript of the evidence is required to be filed by the medical board under L. 1943, c. 633, § 11, it is apparent that claimant's right of appeal or review is effectively denied thereby.

The words "due process of law" when applied to judicial proceedings mean a course of legal conduct consonant with rules and principles established in our system of jurisprudence for the protection and enforcement of private rights. Due process requires notice before judgment and an opportunity to be heard in an orderly proceeding adapted to the nature of the case, and the right of appeal from or review of a decision regarded by a litigant as unjust. Here, the provisions of the statute creating the medical board and defining its duties require the board to determine questions of occupational disease and to hear the evidence and report findings thereon to the industrial commission. Such findings are made binding upon the commission. Therefore, the only review thereof to which a claimant is entitled is a review by this court pursuant to § 176.61 (§ 4320). Our power to review findings of the medical board and to determine whether they are supported by sufficient foundation in fact is accordingly frustrated, because such findings are binding on the commission and the board is not required, under the statute, to file with its report a transcript of the evidence, testimony, or exhibits upon which such findings are based. Thus, a claimant is denied the right of review guaranteed him by the workmen's compensation law, § 176.61 (§ 4320), and by the due process clauses of both the state and federal constitutions. In Ohio Bell Tel. Co. v. Public Utilities Comm. 301 U. S. 292, 300, 302, 303, 57 S. Ct. 724, 728-730, 81 L. ed. 1093, 1099-1101, the United States Supreme Court, speaking through Mr. Justice Cardozo, said:

"* * * The fundamentals of a trial were denied to the appellant when rates previously collected were ordered to be refunded upon the strength of evidential facts not spread upon the record.

"* * * This is not the fair hearing essential to due process. It is condemnation without trial.

    *   *   *   *   *

"* * * Not only are the facts unknown; there is no way to find them out.

"* * * To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable?"

See, Market Street Ry. Co. v. Railroad Comm. of California, 324 U. S. 548, 65 S. Ct. 770, 89 L. ed. —.

In State v. Tri-State T. & T. Co. 204 Minn. 516, 522, 284 N. W. 294, 300, we stated:

"* * * Likewise, in the case of due process the single finding that existing rates are unreasonable is a conclusion and insufficient unless supported by findings of fact more particularly stated which demonstrate the grounds upon which the conclusion is based so that the court may determine whether the order proceeds from a conscientious consideration of the evidence or is arbitrary."

As stated in State ex rel. Ging v. Board of Education, 213 Minn. 550, 564, 7 N. W. (2d) 544, 553:

"* * * [In proceedings for discharge of teachers] *The right of review* to determine whether its [the school board's] findings are based upon substantial evidence or whether they are arbitrary, oppressive, and therefore in excess of its powers satisfies the requirements of due process." (Italics supplied.)

In Juster Bros. Inc. v. Christgau, 214 Minn. 108, 117, 7 N. W. (2d) 501, 507, this court stated:

"The legislature cannot in this manner provide for the arbitrary exercise of power, so as to deprive a person of his day in court to vindicate his rights."

It is our opinion that because the delegation of power to the medical board here in effect denied relator and other claimants under the occupational-disease provisions of the workmen's compensation law an effective right of review or appeal as prescribed by said workmen's compensation act, as well as under the due process guarantees of both the state and federal constitutions, the statute insofar as it creates said medical board and sets forth its functions constitutes an invasion of rights protected and guaranteed by said constitutions, and is therefore null and void.

■ By this, of course, it does not necessarily follow that the entire statute relating to occupational diseases must fall. Minn. St. 1941, § 645.20 (L. 1941, c. 492, § 20), (Mason St. 1944 Supp. § 10933-21), provides:

"Unless there is a provision in the law that the provisions shall not be severable, the provisions of all laws shall be severable. If any provision of a law is found to be unconstitutional and void, the remaining provisions of the law shall remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent."

An examination of L. 1943, c. 633, indicates that the provisions thereof insofar as they relate to the creation of a medical board and describe its functions are severable from the remaining valid provisions thereof, which, standing alone, are complete and capable of execution in accordance with legislative intent. Accordingly, we hold that only the following portions of L. 1943, c. 633, are invalid and unconstitutional:

*Section* 7. Commencing in line 5, "the percentage of such contribution to be determined by the Medical Board,"

*Section 8.* Commencing in third paragraph, line 1, "the medical board finds that". Commencing in third paragraph, line 5, "the medical board decides".

*Section 9.* Commencing in line 2, "on recommendation of the medical board,"

*Section 11.* Commencing in line 15 with the words "excepting that of occupational disease." and continuing through the remainder of said section.

*Section 12.* Commencing in line 1, "to the medical board". Commencing in line 6, "which may include examinations by a member of the medical board".

Elimination of the foregoing provisions will result in determination by the industrial commission of questions of occupational disease in the same manner as it would determine questions of injuries arising out of accidents. Minn. St. 1941, § 176.66 (Mason St. 1927, § 4327), as amended by L. 1943, c. 633, § 4, provides:

"The disablement of an employee resulting from an occupational disease, except where specifically otherwise provided, is to be treated as the happening of an accident within the meaning of the Workmen's Compensation Law and the procedure and practice provided applies to all proceedings under this section, except where specifically otherwise provided herein."

With the elimination of the provisions relative to the medical board, L. 1943, c. 633, § 11, will permit the industrial commission or a referee, according to established practice, to take testimony of one physician for each party on the question of occupational disease. If the commission or the referee hearing such evidence is unable therefrom to determine whether a claimant suffers from an occupational disease within the provisions of the statute, then, by virtue of § 176.66 (§ 4327), which, as indicated, defines disability from occupational disease as the happening of an accident within the meaning of the act, recourse may be had to § 176.19 (§ 4283), which permits the commission or the referee conducting the hearing upon his own motion to designate a neutral physician

in good standing to examine the injured person and report his findings, which, in addition to other evidence, may be weighed by the commission or referee as competent evidence in determining this issue.

■ With the elimination of those provisions creating the medical board and defining its powers, it is clear that the undisputed evidence here compels a finding that relator was disabled as a result of an occupational disease and is entitled to recover under the occupational-disease sections of the workmen's compensation law. There is no evidence to support a contrary conclusion. The industrial commission, under the aforesaid invalid sections of the workmen's compensation act, was required to affirm the findings of the medical board even though in disagreement therewith. We hold that the undisputed evidence, as above set forth, requires a reversal of the findings of the commission and a determination that relator has established that his disability is due to an occupational disease within the provisions of L. 1943, c. 633, § 3(n), (Mason St. 1944 Supp. § 4326[n]), amending Mason St. 1927, § 4326.

■ It has been suggested that the record will not sustain a finding of an occupational disease within the definition of the aforesaid statute, because there is no evidence therein that relator's disability was peculiar to the occupation of shipyard workers, it being the contention that under L. 1943, c. 633, §3(n), evidence of a connection between a claimant's work and his disability is not alone sufficient to bring him within the act's definition of occupational disease. It does not appear that this court has had occasion prior hereto to consider the language involved in the aforesaid statute defining occupational disease. Our compensation act was amended by L. 1943, c. 633, to include occupational diseases. By the amendments, the legislature provided that, to establish an occupational disease, the evidence must disclose (1) that it arose out of and in the course of employment; (2) that it was peculiar to the occupation in which the employe was engaged; and (3) that it was due to causes in excess of the ordinary hazards of employ-

ment. Under the statutory definition, ordinary diseases of life to which all members of the general public are equally exposed outside of employment are not compensable except where they follow as an incident to an occupational disease, or where the exposure peculiar to the occupation makes such disease an occupational-disease hazard.

Here, it would seem that under the testimony of all witnesses relator's disability readily falls within the above statutory requirements. Both medical experts testified that there was a direct causal connection between the disease and the employment. Certainly the court may take judicial notice that bursitis or synovitis is not one of the ordinary diseases of life to which all members of the general public are equally exposed. It is equally clear that the disease is due to causes in excess of the ordinary hazards of employment. The medical experts further testified that the disease was peculiar to any occupation wherein either the knees or the elbows of a worker were required to come in constant contact with cold, hard surfaces, and that bursitis of various kinds was becoming more and more common to shipyard workers; and, in particular, that relator's disability was brought about by the manner in which he was required to work, which was peculiar to his occupation.

There is no evidence whatever in the record to support a finding that relator's disability was due to other causes. Both medical experts conceded that there was no evidence of arthritis. Neither testified to the presence of any other disease. It is true that relator had a high temperature at the time of his first examination, but his doctor pointed out that it may have arisen subsequent to the original disability. No other cause therefor was presented. Relator was not affected with any diseases or disorders prior to the work here involved, and the disability complained of disappeared soon after he terminated it.

The medical expert called by respondents diagnosed relator's disability as a combination of bursitis and synovitis, but repeatedly asserted that it was due to the type of work relator was per-

forming. Under such circumstances, to hold that the disability here was due to some cause not arising out of his occupation would be to resort to speculation and conjecture and to close our eyes to undisputed facts.

The state of Connecticut, under a somewhat similar statute covering occupational diseases, in Glodenis v. American Brass Co. 118 Conn. 29, 40, 170 A. 146, 150, held:

"* * * The Workmen's Compensation Law * * * as it now stands, permitted a recovery of compensation for incapacity resulting from an occupational disease and defined such a disease as one 'peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such.' * * * *This definition does not require that a disease, to be within the definition, should be one which arises solely out of the particular kind of employment in which the employee is engaged, nor that it should be due to causes in excess of the ordinary hazards of that particular kind of employment.* Otherwise the definition would exclude most diseases; * * *. The phrase 'peculiar to the occupation' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations; * * * and the phrase 'employment as such' means employment in general. *To come within the definition an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general.*"
(Italics supplied.)

In LeLenko v. Wilson H. Lee Co. 128 Conn. 499, 504, 24 A. (2d) 253, 256, the Connecticut court enlarges upon the construction of the aforesaid occupational-disease statute as follows:

"We cannot import into the conception of occupational disease

under our law the element that the disease must be a usual or generally recognized incident of the employment. Compensation under our law is not to be denied because the injury would not have occurred except for the peculiar susceptibility of the individual worker. * * * Occupational diseases result ordinarily in incapacity in a relatively small proportion of the number of employees subjected to the risk; indeed, if this were not so, economic considerations would require an abandonment of the employment or a change in its conditions to obviate the risk. There is nothing in the terms of our statutory definition of an occupational disease which suggests that to fall within it a disease must be one which is a usual or generally recognized incident of the employment, and the considerations we have suggested preclude our finding that such a legislative intent is to be implied. A careful consideration of the question now before us negatives any inference to the contrary which might be drawn from our decisions * * *. When we referred in them to disease as being a 'natural' incident of the employment, we used that word in the sense that we have used it in defining proximate causation; it imports not a forward look to determine what risks should have been foreseen, but a tracing back from the results to the circumstances out of which the disease sprang. * * * If, so traced, a disease is a natural result of conditions which are inherent in the employment and which attach to that employment a risk of incurring it in excess of that attending employment in general, an award of compensation is not precluded because the risk is one which has not become generally recognized or because only employees unusually susceptible will suffer from the disease."

Since the evidence establishes all the elements necessary to bring relator's disability within the statutory definition of occupational disease and since the evidence is undisputed that such disability arose out of said disease, we are compelled to reverse the order of the industrial commission with directions to award compensation to relator for disability due to an occupational disease.

By virtue of this opinion, our decision in Ogren v. City of Duluth, 219 Minn. 555, 18 N. W. (2d) 535, insofar as it holds that

the procedural provisions of L. 1943, c. 633, apply in occupational-disease cases, is limited in accordance with the views herein expressed. The provisions in the act for the determination of occupational-disease questions by the medical board no longer apply in such cases. In the Ogren case, the constitutionality of such provisions was conceded; here, their constitutionality is assailed, and we hold them unconstitutional.

Attorneys' fees of $250 are allowed relator in addition to the statutory and ordinary costs and expenses.

Reversed.

