**SOUTHWESTERN BELL TELEPHONE COMPANY, Appellee,**

v.

**ARKANSAS PUBLIC SERVICE COMMISSION; Robert E. Johnston, Chairman; Patricia S. Qualls, Commissioner; and James W. Daniel, Commissioner; Appellants.**

**Communications Workers of America, (Intervenor Below), Appellee.**

No. 86–2100.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1987.

Decided July 29, 1987.

Rehearing and Rehearing En Banc Denied Sept. 24, 1987.

Art Stuenkel, Little Rock, Ark., for appellant.

T. Michael Payne, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, ARNOLD and WOLLMAN, Circuit Judges.

LAY, Chief Judge.

In 1983, Southwestern Bell Telephone Company (SWB or Company) and the Communications Workers of America (CWA) negotiated and signed a three-year labor contract. The contract contained the usual delineation of wages and benefits for jobs included in the bargaining unit. In July, 1984, SWB filed an application with the Arkansas Public Service Commission (Commission) to increase intrastate telephone rates by some $61 million. At hearings on the request, the Commission staff took the position that the Company's wage expenses should be reduced by approximately $7 million because they were unreasonable when compared with expenses for wages and benefits for similar jobs at similar companies in the geographic region.[1] The Company maintained that the Commission was prohibited by the National Labor Relations Act (NLRA) from making adjustments to wages that were the product of collective bargaining. The Commission rejected the Company's position and adjusted downward by some $5 million its wage and benefit expenses for sixteen job positions, thirteen of which were included in the bargaining unit.[2]

The Company appealed the Commission's decision to the Arkansas Court of Appeals in July, 1985, raising the question of federal preemption along with the contention that the order was arbitrary and capricious in many other respects. In December, 1985, after oral argument but before the state court had rendered its opinion, SWB filed a petition in federal district court for a declaratory judgment and a permanent injunction. In July, 1986, the district court[3] determined that the Commission's actions were preempted by the NLRA. This appeal followed.[4] We reverse.

## Abstention

As a threshold matter, the Commission maintains that the district court abused its discretion in failing to abstain from deciding the case because the identical issue was already before the state court of appeals. This argument overlooks our discussion and holding in *Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm'n*, 772 F.2d 404, 417 (8th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). Where a challenge to a state regulatory scheme asserts that the proceeding or regulation at issue is beyond the state's authority, abstention or exhaustion arguments are seldom applicable.[5]

1. The Commission refused to allow SWB to recover for wage and benefit expenses that exceeded by ten percent the average wage and benefit expenses for comparable jobs at other companies.

2. Federal Communications Commission regulations require allocation of the Company's expenses between interstate and intrastate operations. In its first order, the Commission failed to allocate any of the wage and benefit costs to interstate operations, thus overstating the amount of the downward adjustment. At a rehearing, the Commission adjusted the wage and benefit allowance to reflect this allocation. The Commission ultimately disallowed $2,596,986 in nonmanagement wages and $256,542 in nonmanagement benefits and payroll taxes. It granted SWB an overall rate increase of $22,957,000.

3. The Honorable George Howard, Jr., United States District Court for the Eastern District of Arkansas.

4. Approximately two months after the district court's order, the Arkansas Court of Appeals

held that the NLRA did not preempt the Commission's power to deny the wage expenses and affirmed the Commission's order in all respects. *Southwestern Bell Tele. Co. v. Arkansas Pub. Serv. Comm'n*, 18 Ark.App. 260, 715 S.W.2d 451 (1986).

5. The numerous cases supporting this principle are set out in *Kentucky W. Va. Gas Co. v. Pennsylvania Pub. Util. Comm'n*, 791 F.2d 1111, 1115 (3d Cir.1986) (citing cases). In these cases the courts of appeals that have addressed the question have found that abstention is inappropriate where preemption is asserted because the jurisdiction of the state to proceed at all is in question. The only case offered in opposition is the Fourth Circuit's opinion in *Aluminum Co. of Am. v. Utilities Comm'n*, 713 F.2d 1024, 1030 (4th Cir.1983), *cert. denied*, 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984), but even there the court acknowledged that abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is inappropriate in cases where the federal government has preempted the field or where there is a direct, facial conflict between state and federal statutes. 713 F.2d at 1030 (citations omitted).

### Federal Preemption Under the NLRA

■ The Commission's appeal centers on the argument that the NLRA does not prevent a state regulatory body from adjusting downward the expenses a public utility may recover for wages and benefits that were the product of collective bargaining. There is no doubt that a tension exists between federal labor laws protecting the collective bargaining process and state laws charging regulatory bodies with the task of assessing the reasonableness of a public utility's expenses, rates, and revenues. A labor organization invariably uses the collective bargaining process to obtain higher wages and better benefits. At the same time, state regulatory bodies seek to control the cost of utilities, a substantial portion of which goes toward paying wages and benefits. We conclude, nonetheless, that the Commission's disallowance of what it deemed to be unreasonably high wage expenses, while perhaps indirectly affecting future bargaining strategy, does not control the terms of any particular collective bargaining agreement and does not interfere in any impermissible way with the exercise of collective bargaining rights protected by the NLRA.

Arkansas law gives the Commission the authority to establish reasonable rates to be charged for intrastate public utilities. Ark.Stat.Ann. §§ 73–202a, –204 (Repl. 1979). To set these rates, the Commission establishes the total reasonable cost of providing utility service based on the value of the investment the Company has made to provide the service, plus operating expenses. Operating expenses include labor costs. The Commission determined that certain wage and benefit expenses claimed by the Company were disproportionately high when compared with those at similar companies.[6] It accordingly adjusted downward the salary expenses component of overall operating costs.

The Commission's order has no relation to the substantive portions of the labor contract between SWB and CWA and thus has no relation to the substantive enforcement of the NLRA, a role that Congress has reserved for the National Labor Relations Board (Board). *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (state laws intruding on Board's primary jurisdiction to interpret and enforce NLRA are preempted). The Company stipulated that it is not bound by the Commission's determination of reasonable wage expenditures to the extent that it is prohibited from paying the bargained-for wages. Indeed, SWB concedes that it is bound by the contract to pay these wages. Further, the Board has no authority under the NLRA to review for adequacy the wages and benefits agreed upon in collective bargaining. The Commission's action and the statutory authority upon which it is based have as their only purpose and effect the setting of reasonable intrastate telephone rates in Arkansas. This does not interfere with or supplement the Board's jurisdiction to enforce federal labor legislation or regulate industrial relations.[7]

The Commission's order also is not an intrusion on the economic self-help measures available to labor and management that Congress meant to be unregulated. *Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (state law that

---

6. In its appeal in state court, the Company claimed that the Commission's findings and order were arbitrary and capricious. The court disagreed and affirmed the Commission's order in all respects.

7. A typical example of *Garmon* preemption can be found in *Wisconsin Dept. of Indus. v. Gould,* 475 U.S. 282, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). In that case, state law barred employers frcm doing business with the state if they were found by the Board to have violated the NLRA more than five times. The Court applied *Garmon* preemption:

Because Wisconsin's debarment law functions unambiguously as a supplemental sanction for violations of the NLRA, it conflicts with the Board's comprehensive regulation of industrial relations. * * * The manifest purpose and inevitable effect of the debarment rule is to enforce the requirements of the NLRA. That goal may be laudable, but it assumes for the State of Wisconsin a role Congress reserved exclusively for the Board. 106 S.Ct. at 1062.

curtails or prohibits self-help measures to the extent that it frustrates effective implementation of NLRA is preempted). In *Golden State Trans. Corp. v. City of Los Angeles*, 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986), the Supreme Court applied *Machinists* preemption in a case where the local Board of Transportation conditioned renewal of Golden State's taxi franchise on settling a labor dispute with union drivers. The Court held that the Board of Transportation's actions interfered with the bargaining process by encroaching upon permissible economic tactics available to the company:

> Golden State was entirely justified in using its economic power to withstand the strike in an attempt to obtain bargaining concessions from the union. * * * [This] resort to economic pressure was a legitimate part of the collective bargaining process. * * * The Act leaves the bargaining process largely to the parties. It does not purport to set any time limits on negotiations or economic struggle. Instead the Act provides a framework for the negotiations; it "is concerned primarily with establishing an equitable process for determining terms and conditions of employment."

106 S.Ct. at 1399–1400 (citations omitted). The Court rejected the city's argument that it was not regulating labor but instead was exercising a traditional municipal function in issuing taxi franchises. The city's interest in ensuring uninterrupted service to the public by prohibiting a strike by unionized employees did not allow it to restrict an employer's ability, specifically intended by Congress to be unregulated, to resist a strike. *Id.* at 1401.

These operative facts are clearly distinguishable from the facts in this case. Here, the Commission has the authority under Arkansas law to establish intrastate telephone rates. This is not disputed, nor is the Commission's authority to consider the reasonableness of claimed expenses in the ratemaking process. The problem, according to SWB, is that this authority to set rates and protect the interests of the ratepaying public infringes on the duty under the NLRA of both the Company and

CWA to bargain in good faith. When the Commission essentially becomes a third party at the bargaining table, its power of the purse strings invariably affects the parties' negotiations. The Company claims that it would be placed in a "take it or leave it" position with the union in future negotiations if the Commission has the power effectively to veto a wage agreement by denying the Company the funds to pay for it. The Company further maintains that the Commission's action overlooks the complex nature of labor negotiations, the give and take by both parties on many issues, not just wages. It urges that by isolating wages from other bargained-for components of a labor contract, and by further isolating particular jobs, the Commission has ignored the integrated nature of labor negotiations and has interfered with the economic forces that shape the final agreement.

We cannot agree. Nothing in the Commission's order encroaches upon either party's ability to use economic pressure in future negotiations to gain concessions from the other. The Company remains free to resist the union's demands, and CWA may authorize a strike if its terms are not met. Furthermore, the Commission has not vetoed the wage agreement. As we have already pointed out, the Company stipulated that notwithstanding the Commission's order, it is obligated to pay the bargained-for wages. Finally, nothing in the NLRA guarantees that wages agreed upon in collective bargaining will be recovered from consumers, whether the business is regulated or not. This, therefore, is not a case where either *Machinists* or *Garmon* preemption is appropriate.

The First Circuit addressed a similar situation in *Massachusetts Nursing Ass'n v. Dukakis*, 726 F.2d 41 (1st Cir.1984). In that case, the Nursing Association challenged a Massachusetts law that provided a prospective method of reimbursing hospitals for their costs. An overall figure of prospective reasonable costs was derived at the beginning of the year by projecting estimates of component costs. The resulting figure was the amount that a hospital

was allowed to collect for care provided in a given year to all its patients, whatever the source of payment.

The court held that the statute was not preempted by federal labor laws because it affected the labor-management relationship only indirectly through its regulation of the hospitals' annual gross income. *Id.* at 43; *see also Amalgamated Transit Union v. Byrne,* 568 F.2d 1025, 1029 (3d Cir.1977) (en banc) (no preemption where governor threatened to cut off state subsidies to any transit company that agreed with a union to include an open-ended cost of living increase provision in its labor contract).[8] The court also examined the implications of an argument identical to the Company's in this case:

> First of all, in any industry the price of whose product or service—such as electric power, telephone, natural gas, or even rent controlled real estate—is regulated, a state would find its regulatory system vulnerable to preemptive attack on the ground that the overall control of price was too inhibiting an influence on collective bargaining. Logic, however, would carry beyond simple price control. Any state or municipal program that substantially increased the costs of operation of a business in a competitive market would be similarly vulnerable to the preemption argument. *Clean air and water laws, selective cutting requirements in forest operations, industrial safety standards, tax increases—all pro tanto hobble collective bargaining in that they constitute part of the universe in which collective bargaining takes place, just as do general prosperity or depression. But they do not add to or detract from the rights, practices, and procedures that together constitute our collective bargaining system.*

**8.** The dissenters in *Amalgamated Transit Union v. Byrne* distinguished the situation in the instant case from what they considered an impermissible intrusion into the collective bargaining process under the facts of that case:

> [T]here exists a critical difference between a state communicating to all affected parties the extent of finances it intends to grant for carriers' operations and a state communicating that it will not continue its subsidization if the

726 F.2d at 45 (emphasis supplied); *see also Washington State Nurses Ass'n v. Washington State Hosp. Comm'n,* 773 F.2d 1044 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986) (rejecting preemption challenge to statute authorizing state hospital commission to measure the reasonableness of wage costs as a component of the overall costs recoverable in rates charged).

**Conclusion**

The Arkansas Commission is charged with the responsibility of setting rates that state telephone users will pay and determining a fair rate of return that SWB may earn. As part of this process, the Commission assesses the Company's expenses to determine whether they are reasonable. If the Commission finds that they are not reasonable, an issue controlled by state law standards of arbitrariness and capriciousness, then the Commission will not pass them on to consumers in the form of rate increases. We conclude that the Commission's action disallowing recovery of certain nonmanagement wage and benefit expenses does not rise to the level of an impermissible intrusion into or control over the relationship between the Company and CWA. We finally observe, as did the Ninth and First Circuits, that in any regulated industry, myriad governmental decisions, from ratesetting to the imposition of safety standards, undoubtedly will affect labor relations. Any indirect effect of the ratesetting action taken in this case, however, falls short of the kind of state interference with the labor-management relationship that Congress intended to proscribe. The district court's order accordingly is reversed.

carriers agree with the unions to retain uncapped cost of living clauses in their employment contracts. The former communication presumably does not constitute interference with negotiations over wages and working conditions, as it is not a state attempt "to influence the substantive terms of collective bargaining agreements."

568 F.2d at 1035 (Aldisert, J., dissenting).