**THUNDERBIRD MINING CO. and Eveleth Mines, L.L.C.**

v.

**The Honorable Jesse VENTURA, Governor of the State of Minnesota; and John Swift, Commissioner, Iron Range Resources & Rehabilitation Board.**

**No. 99CV1396(JMR/RLE).**

United States District Court, D. Minnesota.

April 26, 2001.

Douglas Paul Seaton, Alec J. Beck, Burk & Seaton, Edina, MN, for Plaintiffs.

Mark Bernard Levinger, MN Attorney General, St. Paul, MN, for Defendants.

## ORDER

ROSENBAUM, District Judge.

Two of Minnesota's taconite mining and processing companies challenge the constitutionality of portions of the Minnesota Iron Range Resources and Rehabilitation Board's ("the IRRRB")[1] enabling statute. The companies contend the fund disbursement method set forth in Minn.Stat. § 298.227 impermissibly interferes with

1. The "Iron Range" is a portion of northern Minnesota where iron ore is mined.

the collective bargaining process. As a result, the companies claim the statute is preempted by federal labor law. The State of Minnesota acknowledges the disbursement procedure grants certain power to Local 6860 of the United Steelworkers of America, but contends the statute is a proper exercise of state power, and is not preempted.

## I. *Background*

Plaintiffs, Thunderbird Mining Co. and Eveleth Mines, L.L.C., mine and process iron ore and produce taconite. Local 6860 of the United Steelworkers of America ("the Union") represents the unionized workers at these facilities.

The IRRRB was established by the State of Minnesota in 1941. It provides funds for programs to develop the Iron Range area's resources, such as vocational training and rehabilitation for area residents. Minn.Stat. § 298.22, subd. 1(3). Under the statute, the IRRRB is authorized to collect taxes on taconite and iron sulphides produced in the region. Minn. Stat. § 298.24. The taxes are distributed to various funds pursuant to Minn.Stat. § 298.28.

This case focuses on one fund in particular, the Taconite Economic Development Fund ("TEDF"). *Id.* at subd. 9a. The release of TEDF funds is governed by Minn.Stat. § 298.227, the statute at issue here. Under the statute, the IRRRB holds the TEDF money in separate funds, tentatively allocated to each of the Iron Range's taconite producing companies. By statute, the funds may only be used "for acquisition of equipment and facilities for the producer or for research and development in Minnesota on new mining, or taconite, iron, or steel production technology." Minn.Stat. § 298.227. The TEDF

money may not be released to a producer for a proposed project unless the IRRRB receives authorization from the company's joint committee of labor and management ("joint committee").

The joint committee consists "of an equal number of representatives of the salaried employees and the nonsalaried production and maintenance employees of that producer." Minn.Stat. § 298.227. A majority vote of the joint committee is required to release the TEDF funds. *Id.* If a joint committee majority vote cannot be attained within two years, the money earmarked for that company's project lapses, and the funds are divided between a taconite environmental protection fund and an economic protection trust fund for northeast Minnesota. *Id.; see also* Minn. Stat. §§ 298.223, 298.292.

In union shops, by statute, "[t]he district 11 director of the United States Steelworkers of America, on advice of each local employee president, shall select the [joint committee's] employee members." Minn. Stat. § 298.227. In non-union shops, the joint committee employee members are chosen by worker election. *Id.* Only one of the seven producers eligible for disbursement of funds is not unionized.[2] Plaintiffs claim the statute's joint committee approval process grants the Union veto power over the grant of these tax funds to the taconite companies.

The statute's practical effect, according to plaintiffs, "has been to provide a 'weapon' to Local Steelworkers Unions for use during collective bargaining with taconite producers." Pl. Mem. S.J., at 4. Although no TEDF money has defaulted to the other statutory funds, plaintiffs complain they and other producers have been forced to make bargaining concessions in order to

---

**2.** Plaintiffs, collectively known as EVTAC, are considered one entity for disbursement pur-

poses. Five other producers are unionized; one is not.

receive majority approval from the joint committee for disbursement of the funds. Among the demands made by the Union, in exchange for release of the TEDF funds, is plaintiffs' assent to an industry-wide pattern collective bargaining agreement which includes specific bargaining concessions.

## II. *Analysis*

The preemption doctrine derives from the Supremacy Clause of the United States Constitution. The Constitution establishes the laws of the United States as "the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. V, cl. 2. When considering a preemption challenge, a court "is not to pass judgment on the reasonableness of state policy," but instead "to decide if a state rule conflicts with or otherwise 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives' of the federal law." *Livadas v. Bradshaw*, 512 U.S. 107, 120, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (citation omitted). Thus, in deciding whether a federal law preempts a state statute, the Court must "ascertain Congress' intent in enacting the federal statute at issue." *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 738, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

Preemption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* (citations omitted). The National Labor Relations Act ("NLRA") contains no express preemption provision. In analyzing a challenge under such a statute, the Court must not find a state statute to be preempted, "unless it conflicts with federal law or would frustrate the federal scheme," or

unless the Court discerns "from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Building and Construction Trades Council v. Associated Builders and Contractors*, 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993).

### A. *Federal Labor Law Preemption*

■ NLRA preemption analysis has devolved into two distinct doctrines, commonly referred to as *Garmon* and *Machinists* preemption. *Garmon* preemption, which derives from *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), "protects the primary jurisdiction of the National Labor Relations Board (NLRB) by displacing state jurisdiction over conduct which is 'arguably within the compass of § 7 or § 8 of the Act.' " *St. Thomas—St. John Hotel & Tourism Assoc. v. Government of the United States Virgin Islands*, 218 F.3d 232, 239 (3d Cir. 2000) (citation omitted). *Garmon* preemption "prevents States not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act." *Wisconsin Dept. of Industry, Labor and Human Relations v. Gould*, 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). The doctrine is premised on Congress's overriding interest in uniform, national application of the NLRA, rather than on protecting particular conduct of private bargaining parties. *See St. Thomas*, 218 F.3d at 239.

■ *Machinists* preemption, by contrast, protects the collective bargaining process itself from interference. As one court has observed:

*Machinists* preemption can be described as a form of conflict preemption under

which state regulation of the bargaining conduct of private parties is displaced because it conflicts with the purpose of Congress in enacting the NLRA to leave that conduct "to be controlled by the free play of economic forces."

*St. Thomas,* 218 F.3d at 239 (citation omitted). *Machinists* preemption examines the crucial question of whether the legislation at issue disturbs "the balance struck by Congress between the conflicting interests of the union, the employees, the employer and the community." *Lodge 76, International Assoc. of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 146, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (quoting *Garner v. Teamsters Union,* 346 U.S. 485, 500, 74 S.Ct. 161, 98 L.Ed. 228 (1953)). Both sides agree, and the Court concurs, that *Machinists* preemption provides the analytic framework here. The parties disagree, however, on how Minn. Stat. § 298.227 fits within the *Machinists* framework.

Two lines of *Machinists* preemption have developed. One line grows from *National Labor Relations Board v. Insurance Agents' International Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). This line invalidates any legislation which tilts the negotiating scales concerning the "economic weapons a party might summon to its aid." *Insurance Agents',* 361 U.S. at 490, 80 S.Ct. 419. According to the Supreme Court, "The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft–Hartley Acts have recognized." *Id.* at 489, 80 S.Ct. 419.

Thus, a state or local government's interference with the substantive or procedural aspects of collective bargaining violates Congress' intention "that the parties

should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *Id.* at 488, 80 S.Ct. 419. A state law which influences either the economic weapons available to the bargaining parties or the outcome of the negotiations is preempted. *See Livadas v. Bradshaw,* 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (finding preempted a state policy preventing enforcement of state wage laws by unionized workers); *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986) (invalidating a city's action in conditioning a franchise award on the successful settlement of an ongoing labor dispute); *Lodge 76, International Assoc. of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 146, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976) (overturning a state board's prohibition against the union's refusal to work overtime); *Cannon v. Edgar,* 33 F.3d 880 (7th Cir.1994) (holding preempted state legislation requiring the gravediggers' union to negotiate as to a particular subject); *Employers Association v. United Steelworkers,* 32 F.3d 1297 (8th Cir.1994) (preempting a state statute forbidding the hiring of striker replacement workers); *Barnes v. Stone Container Corp.,* 942 F.2d 689 (9th Cir.1991) (invalidating the imposition of a "just cause" term for employment contracts in the collective bargaining area); *Derrico v. Sheehan Emergency Hospital,* 844 F.2d 22 (2d Cir.1988) (prohibiting a cause of action for implied contract after the expiration of a collective bargaining agreement); *United Steelworkers v. St. Gabriel's Hospital,* 871 F.Supp. 335 (D.Minn.1994) (declaring preempted state legislation requiring a successor employer to honor the terms of a previous collective bargaining agreement). This lengthy recitation makes clear that any state attempt to interfere, directly or

indirectly, with the bargaining parties' economic weapons is preempted by federal law.

In contrast, the second line of the *Machinists* doctrine carves an exception for state statutes of general application which deal with issues of fundamental state concern, such as health, safety, or welfare. This kind of legislation is permitted, because it is part of "the backdrop of state law that provided the basis of congressional action." *Taggart v. Weinacker's, Inc.*, 397 U.S. 223, 228, 90 S.Ct. 876, 25 L.Ed.2d 240 (1970) (concurring opinion). Preempting such legislation would "artificially create a no-law area." *Id.* The Supreme Court has noted that federal labor law "in this sense is interstitial, supplementing state law where compatible, and supplanting it only when it prevents the accomplishment of the purposes of the federal Act." *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 756, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985).

■ Thus, laws dealing with general labor issues, such as unemployment compensation, minimum health benefits, and severance pay, do not trench impermissibly upon the collective bargaining process. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (upholding a state law requiring severance pay for all employees in the event of a plant closing); *MetLife*, 471 U.S. at 755, 105 S.Ct. 2380 (upholding a state law requiring minimum health benefits for workers); *New York Telephone Co. v. New York State Dept. of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (upholding a state unemployment compensation scheme as applied to striking workers). Similarly, state regulation of an industry, although it may have the indirect effect of impacting negotiations, has been allowed under the NLRA. *See Southwestern Bell Telephone Co. v. Arkansas Public*

*Service Commission*, 824 F.2d 672 (8th Cir.1987) (holding state regulation of the telephone industry is not preempted under the NLRA); *Massachusetts Nurses Association v. Dukakis*, 726 F.2d 41 (1st Cir. 1984) (holding state regulation of hospital costs does not impermissibly interfere with the collective bargaining process). It is axiomatic that a court " 'cannot declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions; obviously, much of this is left to the States.' " *MetLife*, 471 U.S. at 757, 105 S.Ct. 2380 (citation omitted).

### B. *Minnesota Statute § 298.227*

The Court, then, must determine which *Machinists* subspecies best describes § 298.227: Does the statute impermissibly intrude into the collective bargaining process, or does it merely form part of the backdrop of state laws against which collective bargaining takes place? Plaintiffs urge the former; defendants the latter.

■ State statutes which touch upon or concern labor relations should be neutral. *New York Telephone Co. v. New York State Dept. of Labor*, 440 U.S. 519, 526, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979). Defendants contend the statute is neutral, applying equally to union shops and non-union shops and granting equal power to labor and management. But the Court considers that, while defendants' analysis is correct in theory, it fails in practice. This statute puts an additional—and extremely powerful—weapon into the hands of the Union; in doing so, it impermissibly intrudes on the collective bargaining process.

This is because TEDF funds may only be used for certain defined projects. These projects, in essence, involve major capital improvements, including the acqui-

sition of equipment and facilities. Such expenses directly impact a company's ability to function profitably. As such, they directly benefit management while only indirectly benefitting labor.

Thus, while both sides theoretically have veto power over the funds, the practical reality is that only the Union will ever use it. It is difficult to conceive of a situation where a taconite producer, given a choice, would ever reject "free" money. The Union, on the other hand, might clearly consider the acquisition of these sums to be against its interest, absent a major management concession. As an example, assume a machine can be purchased which performs the work of three or four union workers; it is unlikely in the extreme such a device could be acquired using TEDF funds absent a compensating management concession. When seen in this light, Minnesota's statute, like the state action involved in *Machinists,* "has altered the economic balance between labor and management." *New York Telephone,* 440 U.S. at 532, 99 S.Ct. 1328.

Defendants contend the statute has no impact on the balance of economic power because plaintiffs are never faced with a worse prospect than would be faced in the absence of the statute. Essentially, defendants' theory is that since plaintiffs are not automatically entitled to TEDF funds, any loss of those funds because of management's resistance to Union demands for concessions leaves a company in the same position it would occupy if there were no statute. Defendants' argument fails, however, because it misconstrues federal labor law by looking to the result, rather than the process.

Federal labor law "is concerned primarily with establishing an equitable *process* for determining terms and conditions of employment." *MetLife,* 471 U.S. at 753, 105 S.Ct. 2380 (emphasis supplied). By giving the Union a thumb to put on the economic scale, the State has improperly distorted that process, regardless of the outcome. Congress's goal in enacting the NLRA was to create a collective bargaining process free of any control beyond that established by federal law. As the Supreme Court has held, this means "that parties need not make any concessions as a result of Government compulsion." *NLRB v. Burns International Security Services,* 406 U.S. 272, 287, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (quoted in *United Steelworkers v. St. Gabriel's Hospital,* 871 F.Supp. 335, 339 (D.Minn.1994)).

Here, Minnesota's statutory scheme intrudes into the collective bargaining process. The Court finds it does so by granting substantial economic power to the Union, aiding it in wresting concessions from management. "*Machinists* indicates that the States are not free, entirely and always, directly to enhance the self-help capability of one of the parties to such a dispute so as to result in a significant shift in the balance of bargaining power struck by Congress." *New York Telephone Co. v. New York State Dept. of Labor,* 440 U.S. 519, 548–49, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979) (Blackmun, J., concurring).

Minn.Stat. § 298.227 improperly shifts the carefully crafted "balance of bargaining power struck by Congress." That the shift is indirect is irrelevant: A state may not accomplish indirectly what it is forbidden to accomplish directly. Under the federal labor law's broad preemptive scope, "the State has no authority to introduce its own standard of 'properly balanced bargaining power,'" whether the introduction of that standard occurs explicitly or implicitly. *See St. Gabriel's,* 871 F.Supp. at 344.

The Court, of course, recognizes that federal preemption still affords states a

degree of power to regulate aspects of the relationship between labor and management. But it cannot seriously be argued that § 298.227 falls within the sort of general regulation permitted under the NLRA. The laws which are permitted are entirely different from § 298.227:

> Clean air and water laws, selective cutting requirements in forest operations, industrial safety standards, tax increases—all *pro tanto* hobble collective bargaining in that they constitute part of the universe in which collective bargaining takes place, just as do general prosperity or depression. But they do not add to or detract from the rights, practices, and procedures that together constitute our collective bargaining system.

*Massachusetts Nurses Assoc. v. Dukakis*, 726 F.2d 41, 45 (1st Cir.1984) (quoted with approval in *Southwestern Bell Telephone Co. v. Arkansas Public Service Commission*, 824 F.2d 672, 676 (8th Cir.1987)). Minnesota's statute—involving, as it does, a cash-dollar impact, rather than a business or community regulating regime—does more than simply alter the backdrop against which negotiations take place; it alters the very negotiating process itself. This is an impermissible intrusion into the field of federal labor law.

Although § 298.227's impact is more subtle than the statute at issue in *Employers Association, Inc. v. United Steelworkers*, 32 F.3d 1297 (8th Cir.1994), its result is the same: "The statute permanently and substantially shifts the terms of bargaining in favor of the union ... '[it] has materially altered the Congressionally defined equilibrium which exists between management and organized labor in collective bargaining negotiations.'" *Id.* at 1299 (citation omitted). Such a mechanism is forbidden under federal law.

## III. *Severability*

■ Having determined that the NLRA preempts Minnesota's statutory disbursement method under § 298.227, the Court must decide whether the remainder of the statute can survive in the absence of the preempted portion. In Minnesota, statutory severability is favored:

> unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so dependent upon, the void provisions that the court cannot presume the legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

Minn.Stat. § 645.20.

Here, plaintiffs urge the Court to strike only the offending language, leaving the remainder of the statute untouched. They claim the legislature intended "to return some of the TEDF money to taconite producers for the purpose of growing their businesses and protecting jobs." Pl. Mem. S.J. at 17. Defendants respond that the IRRRB statute's joint committee approval process is an integral part of the statute; severance, therefore, is inappropriate.

The Court finds the statutory language favors defendants' position. A fair reading of the statutory scheme shows the TEDF's disbursement mechanism, at its best, offers an incentive for taconite producers to work cooperatively with the Union. At worst—and, here, impermissibly—it operates as a device to force taconite producers to accede to labor's demands.

But in enacting § 298.227, Minnesota's legislature did not simply give the money to one side. It provided a two-year window for the joint committee to reach

agreement. If labor and management could not agree within the established time limit, the funds would be irrevocably lost. In prescribing this mechanism, the legislature indicated its principle purpose was not simply to turn funds over to taconite producers for approved projects, but to do so through a defined procedure.

Unlike *Hunter v. Zenith Dredge Co.*, 220 Minn. 318, 19 N.W.2d 795 (1945), this is not a case in which "the remaining valid provisions [of the law], . . . standing alone, are complete and capable of execution in accordance with legislative intent." *Id.* In fact, if the Court were to grant plaintiffs' proposed severance, the statute would be turned on its head. If the Court struck only the preempted portions of § 298.227, the statute would be converted into a simple grant to taconite producers. Plaintiffs' argument devolves into: "Here is a pot of money. Now that the Union is out of the process, give it to us." The Court discerns no such intent from the language of Minn. Stat. § 298.227.

Instead, the statutory language reveals the compromise embodied in the joint committee approval process, and the integral part this process plays in the statute. Against this backdrop, the Court "cannot presume the legislature would have enacted the remaining valid provisions without the void one." Minn.Stat. § 645.20. After applying this analysis, the Court finds that a decision simply severing the invalid joint committee disbursement mechanism from the remainder of the statute would frustrate the legislature's intent. *See Archer Daniels Midland v. Minnesota*, 315 N.W.2d 597, 600 (Minn.1982) (refusing to sever void and valid provisions when to do so would frustrate legislative intent). The statute, therefore, must be stricken in its entirety.

### IV. *Conclusion*

The joint committee approval process set forth in Minn.Stat. § 298.227 impermissibly interferes with the collective bargaining process by disturbing the equilibrium established by Congress. The statute is therefore preempted under the Supremacy Clause of the United States Constitution. As the Court cannot presume § 298.227 would have been passed without the critical compromise feature, the void language is not severable. The Court, therefore, strikes the statute in its entirety. Accordingly, IT IS ORDERED that:

1. Plaintiffs' motion for summary judgment is granted.

2. Minn.Stat. § 298.227 is declared unconstitutional and stricken in its entirety.